## Case No. 10,138.

### NEVITT v. CLARKE et al.

[Olc. 316.] [1]

District Court, S. D. New York. April, 1846.

SEAMEN'S WAGES—SENT TO HOSPITAL IN FOREIGN PORT—ABSENCE—DEPARTURE OF VESSEL—RIGHT TO BE CURED — AMENDMENTS TO PLEADINGS.

1. If a sick seaman be sent from a ship to a hospital in a foreign port, and the ship leaves the port without his rejoining her, he is not to be regarded absent without leave, so as to stop the running of his wages. A contract of hiring for a voyage to different ports in the Pacific and back to the United States. or for a period of eighteen months, is not fulfilled as to the ship-owners by lapse of the term, or by the seaman remaining behind in a hospital abroad, unless opportunity, means and time are afforded him to return to his home port.
[Cited in Heynsohn v. Merriman, 1 Fed. 729; Highland v. The Harriet C. Kerlin, 41 Fed. 224.]

[1] [Reported by Edward R. Olcott, Esq.]

2. A ship having left a seaman at Valparaiso and immediately thereafter proceeded to Callao, where she was sold to foreigners, and taken into their employ on a different voyage, he was not bound to rejoin her, or offer to do so if within his power. In such case the owners are liable to the seaman in damages for the breach of the shipping contract on their part. These damages are not made vindictive on the footing of a wilful tort, but are usually measured by the actual loss to the seaman.

[Cited in The Ben Flint, Case No. 1,299; Worth v. The Lioness No. 2, 3 Fed. 925.]

3. Quere, whether, if demanded in the libel, the extra wages given by the act of congress of February 28, 1803 [2 Stat. 203], can be recovered in addition to wages and expenses?

4. Ship-owners will not be held liable for the value of a seaman's wearing apparel and effects, upon proof that he left the ship to be placed in a hospital, without other evidence showing they were detained on board.

· 5. The privilege of seamen to be maintained by the ship, and cured at her expense of a disease or disability incurred in the service of the ship, continues no longer than their right to wages under their contract in the particular case.

[Cited in The City of Alexandria, 17 Fed. 394; The J. F. Card, 43 Fed. 94; The Tammerlane, 47 Fed. 825.]

6. The case of Reed v. Canfield [Case No. 11,-641], considered and doubted. When objections are made at the hearing, to the want of proper form in the pleadings or proceedings, apparent upon their face, the court will permit an amendment to be made therein instanter.

7. It can, also, at discretion, allow amendments to the merits in the pleadings at any stage of the cause prior to a final decree.

8. When a party proceeded against is named in the body of the libel, a decree secundum allegata et probata may be rendered against him, although he is not named in the prayer for relief.

9. If a party to an action dies pending a suit in this court, and the cause of action survives, no disadvantage accrues therefrom to either party. A suggestion of the fact apud acta, removes the technical difficulty.

This action was commenced in personam against the respondents [William Clarke and others], as late owners of the bark Mescino, and seeks the recovery of eight hundred and eighty-five dollars, with interest thereon. Six hundred dollars are claimed as wages due the libellant [John Nevitt] for his services as seaman on board the vessel; the further sum of one hundred and ninety-seven dollars for board in the city of New-York, during the continuance of a sickness contracted on board the vessel on her voyage, and seventy-five dollars for his clothes, &c., alleged by him to have been kept by the master of the bark on board the vessel, and never restored to the libellant. The facts established on the trial of the cause were, that the libellant shipped in New-York for a voyage in the vessel to various ports in the Pacific, and back to the United States, or for the period of eighteen months, at twelve dollars per month. The vessel left this port in February, 1840, and arrived at Valparaiso in May thereafter. The libellant then left her and was taken to the hospital, and continued there until July following, when he

was shipped by the American consul, on board the ship Rachel for the United States, and arrived at this port October 31, 1840. The bark was sold by the captain at Callao, in July, 1840, in pursuance of a previous contract, and duly transferred to the purchasers, but the same master remained in command of her after the sale. On the passage of the vessel out to Valparaiso, some turpentine casks stowed below, as part of her cargo, were burst in heavy weather, and most of the ship's company were sickened by exhalations from it. The libellant, particularly, was seriously affected in his loins and kidneys, voiding blood with his water, and was greatly debilitated in strength, and unable to perform duty because of such sickness, and for that cause left the vessel at Valparaiso. He never after had an opportunity to rejoin her. On his return home, he continued feeble, but did such duty during the voyage as his strength permitted. Since his return he has made one voyage to the West Indies, but his general health has continued greatly impaired, and he has been most of the time for that cause out of employ, and at board. He has also been attended by a physician at times, since his return from the Pacific.

Burr & Benedict, for libellant.

F. B. Cutting, for respondents.

BETTS, District Judge. The first point to be considered is the period for which the libellant, under the facts, is entitled to wages. He claims their continuance to the commencement of this suit, because the vessel had not then returned to the United States, and completed the voyage for which he agreed. The respondents insist that the contract was terminated by the libellant's leaving the vessel in Valparaiso, as he never afterwards sought to rejoin her; or with her sale at Valparaiso, in July, 1840, or at the furthest, on his arrival at this port, October 31, 1840.

The contract of hiring being for a voyage out and home or for a term of eighteen months, was not fulfilled on the part of the ship, either by lapse of the term or the absence of the libellant, unless the respondents prove the failure was owing to the fault of the libellant. He is entitled to compensation conformably to the principle which prevails where the voyage is broken up abroad by the owners, or the seamen is intentionally left in a foreign port.

I think upon the proofs, there was sufficient reason shown for the libellant's absence from the vessel at Valparaiso; and as he was taken immediately from the ship to the hospital, it is to be presumed he left with the assent or under the direction of the master. No evidence is given that the master offered him provisions or medicines on board the ship, or afterwards reclaimed him from the hospital or gave him an opportunity to return to the vessel; and as it appears that the ship was sold at Callao in July, immediately after and

about the time the libellant was discharged from the hospital at Valparaiso, and was transferred to foreigners, and went directly into their employ, he was not bound, if within his power, to join her or continue in her service. Such sale by the owners terminated the contract on the part of the crew, and they were placed by it, at their option, in the same condition as to their rights and remedies as if they had been discharged from the vessel or her voyage had been wholly abandoned. Hindman v. Shaw [Case No. 6,514]; Emerson v. Howland [Id. 4,441]; Moran v. Baudin [Id. 9,785]; The Cambridge, 2 Hagg. Adm. 243.

The cases cited recognize the rule of the maritime law, that seamen in case of abandonment abroad or the sale of the vessel, are entitled to compensation by damages; and various methods are indicated for ascertaining and fixing the amount of such damages. The act of congress of February 28, 1803, c. 62 [2 Story's Laws, 883; 2 Stat. 203, c. 9], may perhaps be regarded as prescribing the rule of damages when the voyage is broken up in a foreign port by the sale of the vessel, but it would not necessarily include the case of a seaman left in a foreign port by the vessel previous to her sale. His rights would be fixed by that abandonment of him by the master, and not by the after sale of the ship. Although compensation by way of damages against the master or owners for such departures from the contract imputes it to be wrongful in respect to the sailor, yet the common occurrences of commercial business naturally leads all parties to contemplate changes of that character as incident to navigation and trade; and the courts, accordingly, rarely if ever countenance a demand of vindictive damages therefor as cases of wanton and unjustifiable tort. Wolf v. Oder [Case No. 18,027]; The Elizabeth, 2 Dod. 407, 411.

The courts seek rather a fair indemnification of the seamen than the infliction of punishment on the master or owners of the ship. But indemnity will ordinarily be found in continuing the wages of the seamen to the termination of the voyage, and his return to his home port, or for a time reasonably sufficient for such return, together with repayment of the expenses of his passage, when any have been incurred. On the other hand, he is to be considered compensated pro tanto towards those allowances, by wages earned by him in the interim. 2 Dod. 411; Ex parte Giddings [Case No. 5,404]; 3 C. Rob. Adm. 92; Hoyt v. Wildfire, 3 Johns. 518; Ward v. Ames, 9 Johns. 138; 11 Johns. 66; Pitman v. Hooper [Case No. 11,185]. And such earnings will be credited the owner and deducted from the total amount of wages.

In this case I think the libellant is entitled to wages up to his arrival in this port, and as to him the voyage is to be regarded terminated at that time. The libel does not demand the three months extra wages provided by the act of February, 1803, because of the sale of the ship, and it is not, therefore, necessary to inquire whether the payment can be enforced when the sale is after the actual connection of the seaman with the vessel is ended. There is no foundation in the reason of the case, nor do I find any in the authorities for considering the voyage continuing, in respect to time, until the actual return of the ship to the United States. Had he been brought home by the vessel as soon as he could return from Valparaiso, the contract of the ship would have been ended at her option, although he was in full health and desired to continue with her the full period of time stipulated in the shipping articles; and all he could equitably require of the ship or owners, in his enfeebled condition, was to replace him in his home port without charge, and with the continuance of wages to the time of his return. There is no fact in proof from which it can be implied that the libellant incurred any expense for his passage home, and no allowance, therefore, can be awarded him other than his wages. He has given no proof in support of his allegation that the master detained his wearing apparel on board the ship when he left her for the hospital at Valparaiso; and, in the absence of testimony, the presumption is, that he took it ashore with him. The inference that a sailor's wearing apparel is detained by the ship could never be raised, except in case of his desertion, or being forcibly put ashore, or wrongfully abandoned by the master when ashore.

The remaining inquiry upon the merits is, whether the libellant is entitled to be maintained at his home port during the continuance of the malady contracted on the voyage, and cured at the expense of the ship or owners. The doctrine of the maritime law, declared in the ordinances, edicts and decisions of commercial nations is, that a mariner falling sick during a voyage, or hurt in the performance of his duty on ship-board, is to be cured at the expense of the ship. Abb. Shipp. p. 146, note 1; 2 Browne, Civ. and Adm. Law, 182; Curt. Merch. Seam. 106–110, and the authorities there cited; 3 Kent, Comm. 184, 185.

The libellant insists that both public policy and the plain text of the laws of the sea give him a fixed right to be treated and maintained at the charge of the respondents whilst his disability remains. A like position was taken in the first circuit in the case of Reed v. Canfield [Case No. 11,641]. Judge Story felt the force of the interrogatory which naturally arises from this rule. Is the obligation imposed a positive one to cure the seaman? And does it stand in force so long as the illness or the wound incurred on ship board is unhealed? And in my humble judgment his decision in the cause fails to supply a clear and satisfactory explication of the difficulty. His answer is, that the law embodies in its very formula the limit of the liability. The seaman is to

be cured at the expense of the ship of the sickness or injury sustained in the ship's service; and when the cure is completed, at least so far as ordinary medical means extend, the owners are freed from all other liability. Reed v. Canfield [supra]. This statement indicates no limitation to the obligation of the owner short of a complete cure, unless it may be implied that he does not become responsible for inefficient efforts to cure, when ordinary medical means are used, and fail to accomplish it. But it would seem to result from the terms in which the doctrine is stated, that the owner remains chargeable with the expenses sustained by a seaman in employing medical means to effect a cure, so long as the necessity for such expenses abides. Certainly the court in that case points out no restriction or qualification to such absolute obligation. The doctrine is supposed to be founded in the laws of Oleron (articles 6 and 7), and to be incorporated into the maritime codes of most commercial nations. Pardessus' Collection of Maritime Laws, vols. 1, 2, 3; Cleirac, Us et Coutumes, 5 Poth. p. 376, arts. 188, 189; 2 Browne, Civ. & Adm. Law, 182. The French Ordinance of Marine and Code du Commerce adopt the rule in the same general language; the seaman is paid his wages, and tendered and nursed at the expense of the ship when he falls sick during the voyage. Ord. Mar. art. 11; Code de Comm. liv. 2, tit. 5, art. 262. It is manifest that a construction of this law, which should charge owners of vessels with the support of sick crews without limitation of time, would be most oppressive in its consequences, if it did not also tend to impair to a serious degree the maintenance and prosperity of a merchant marine, and thus become a public evil. The ship and owner would be rendered liable for the support of sick seamen out of each successive crew and voyage, who would be made pensioners upon the owner so long as their infirmities remain uncured. This rule does not embody in itself any restriction or limitation of liability short of the consummation of a cure, and the case of Reed v. Canfield [supra], in reposing upon the formula of the law as the measure of the owner's responsibility, would seem to sanction and adopt it according to its natural bearing. All from which the owner is exempted by that doctrine is a liability of sailors for consequential damages to them resulting from their sicknesses or bodily wounds; but its apparent tenor is to demonstrate that an uncured malady or wound is not of that character, and the inference accordingly is that the owner, after the voyage has been completed, is yet subject to charges for its treatment until a full cure is effected. It is not necessary to discuss the application of the rule to special classes of cases nor to impugn the justice of the decision in Reed v. Canfield upon the circumstances of that case. But I cannot subscribe to the position that seamen can

exact any remuneration from owners of a ship after a voyage is completed, and their connection with the vessel has ceased, in satisfaction of expenses for their support or medical treatment incurred subsequent to that time.

The privilege of seamen, in distinction from the rights of others hired for services (Poth. Cont. Louage de Matelots, art. 189), is to have wages so long as they are bound to the ship, although disabled from performing any services, and a continuance of their right to maintenance and cure is justly concurrent with that privilege, and in principle ought not to extend beyond it. Pothier vindicates the allowance of these extraordinary privileges upon the policy of encouraging men to embrace that profession, and also because having to run the risk of losing all wages in case of the loss of the vessel and freight by shipwreck, it is just, in recompense of such risk, that their pay should continue during periods they may be prevented rendering services by reason of sickness or disabilities incurred on board, being a vis major in that respect. 5 Poth. p. 377, art. 189. And it is to be remarked that this learned jurist suggests no direct limitation to the provision for sickness, and that his language might be taken to imply that the duration of wages is to be coeval with the continuance of the disability. His words are: "L'ordonnance conserve aux matelots leur loyers pendant le temps de leur maladie, lorsqu'é tant au service du navire ils sont tombés malades pendant le cours du voyage." In my opinion, however, this position imports that the treatment for sickness stands on the like footing, and is recoverable by the seamen for the same period as wages, it being a part of their necessary nourishment during the term of their hiring.

The terms of the ordinance of Louis XIV. art. 11, unite the provision for wages and sickness, and apply the recompense alike to both: "Le matelot qui tombera malade pendant le voyage. sera payé de ses loyers et pansé aux depens du navire." Valin, in his commentary on the article, reasons theoretically that it would be just that seamen wounded in combating for the defence of the vessel or cargo, if maimed or disabled for life, should be supported during life at the expense of the ship and cargo; but he says a burthen of the kind would check commerce, and besides, that pensions or recompenses of that character should not be thrown on individuals, but be bestowed by governments. 1 Valin, 722. This sentiment had relation to military services, and no way favors the doctrine that seamen in commercial employment alone acquire a right against individual ship-owners to any support or cure after the term of their employment is ended. Cleirac plainly limits the privilege in stating that seamen sent ashore to the hospital are to be maintained there at the expense of the ship, whilst the voyage

endures. Cleirac, Us et Cout. 17, e. Thus, by implication at least, recognising the liability in respect to the case of sick seamen, to be no further in extent of time than payment of wages. Boulay-Paty cites an arèt of the court of cassation, giving to the provision in the Code, that the sick seaman shall be treated and cured at the expense of the ship (Code du Commerce, art. 262), the qualification, "whilst he is on the ship, or employed in its service." 1 Boulay-Paty, 202. This, in my opinion, is the sensible limitation of the rule, and enforced to that extent, it affords a liberal and just encouragement to seamen, without imposing an indefinite burthen on ship-owners. To give to the provision the full effect of the terms in which it is expressed, would be to cast upon ship-owners the charge of all seamen, for their lives, who fell sick, or were injured at any time in the employment of their vessel. A liability so hazardous would be oppressive and disastrous to navigation and trade.

I hold that the right of the libellant to wages, and his right to support or medical treatment at the expense of the respondents, supposing his cure not then completed, ended on his arrival in New-York, October 31, 1840, and that his demand for further compensation in that behalf must be denied.

Several formal objections were taken by the respondents to the correctness and sufficiency of the pleadings and proceedings on the part of the libellant. They do not appear to the court of a character to affect the merits or the form of the decree asked for. It is objected, that no order is prayed against Swasey, one of the respondents, and that accordingly he cannot be charged, in any respect, as the decree must be in correspondence with the allegations and prayer of the libel. The name of this respondent is written in the body of the libel but is not repeated in the prayer. The libellant, however, asks for a decree conformably to the case made by him, and it was no way essential that he should pray it specifically against each of the respondents by name. At most the error is merely formal, and can be rectified by the court at hearing, if important to give consistency to the minutes, or to render the ultimate act of the court formally correct. Dunl. Adm. Prac. 283; Id. 211; Betts, Adm. 57, 59; Jud. Act Sept. 24, 1789, § 24 [1 Stat. 85]. If the objection was in any way important to the interests of the defence, and had been made by special exception before issue upon the merits, and the court had exacted in the structure of the pleading all the provisions required by courts of common law, or in England by the ecclesiastical courts, the act of congress authorizing amendments and the practice of this court, would enable the party committing the error to have it rectified instanter at any time before final decree rendered and the close of the term. The death of one of the respondents since the suit was commenced cannot affect the proceedings. It would be irregular at law to raise the objection on proof at the hearing, and in this court no advantage could be taken of it by any mode of pleading, when the cause of action survives. Cir. Ct. Rules 56–59. All that the practice of the court would require would be the suggestion of the fact on the proceedings, or apud acta, and that ordinarily must be made by the parties with whom the death has occurred, and not by the opposite ones. There is accordingly no deficiency shown in the pleadings which can prevent or delay judgment for the libellant.

I think the libellant is entitled to recover full wages up to the time of his arrival at this port, and interest upon the sum which shall be reported due him from the time his suit was commenced. He had made no previous demand on the respondents, and remained here from 1840 without notice to them of his existence, or that he had any claim against the ship or them for wages. His excuse, that he was waiting the return of the ship, ought not to avail him to impose interest on the respondents, without proof that they knew of his services, and that wages were in arrear to him. If his action was defended under the expectation that he could subject them to the expense of his support, so long as he remained unable to do duty and maintain himself, that hope of enhancing the amount of his recovery affords no reason for charging them with interest on a concealed demand, and one not shown by the proofs that the respondents had any means of ascertaining otherwise than by evidence in the libellant's possession.

The decree will be that the libellant recover his wages, according to his contract, from the time he entered on board the vessel until his return to New-York, with interest since the commencement of this suit, deducting all payments and advances. He will also recover his costs to be taxed.

The usual reference will be taken to ascertain and report the balance of wages due according to those directions.